**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**Case No.:**

BANKUNITED, AS SUCCESSOR IN INTEREST TO
BANKUNITED, FSB,

    Plaintiff,   **14-81232-Civ-MARRA /MATTHEWMAN**

vs.

FREDERICK S. BLUM

    Defendants.
_____/


_____


**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR**
**PALM BEACH COUNTY, FLORIDA**

BANKUNITED, AS SUCCESSOR IN INTEREST TO
BANKUNITED, FSB,

            **CASE NO.:  50-2010-CA-**
            **003287-XXXXMB**

    Plaintiff,

vs.

FREDERICK S. BLUM

    Defendants.
_____/


**<u>NOTICE AND PETITION FOR REMOVAL</u>**

**TO:** The Honorable Judges of the United States District Court for the Southern District of

Florida:


NOW COMES **FREDERICK S. BLUM** (herein "Defendant") and Petitioner for removal.

Take notice that pursuant to 28 U.S.C. §§ 1331 Federal Question, 15 U.S.C. § 1692(e), 18 U.S.C.

§ 1346, 1332 Diversity Jurisdiction, 1441 Removal Generally1443(1), Civil Right, 1446(a) &

Rule 11 FRCP, 42 U.S.C. 1983 Civil action for deprivation of right, 1985(2) &(3), and 1986

Action for neglect to prevent, the defendant from losing his property so hereby removes this

action from the **IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT**

**IN AND FOR PALM BEACH COUNTY, FLORIDA,** Florida to the United States District

Court of Southern District of Florida, Fort Lauderdale Division. In support of removal,

Defendant submits the following:

## JURISDICTION

### Federal Question Debt Collection Jurisdiction Grounds for Removal:  Deceptive Collection Activity

1.      Defendant submits the within the Notice of Removal several issues arise giving this court

Federal question jurisdiction.  The claim is not cognizable under state law as pleaded.

2.      Plaintiff could have brought it in federal court originally, as a civil action arising under

the laws of the United States.  *28 U.S.C. § 1331.*

3.      The controversy herein between the Plaintiff and Defendant/Petitioner is a controversy

based upon consumer protection rights created by and enforced through federal statute, 15 U.S.C.

§ 1692, *et seq.*, entitled the Fair Debt Collection Practices Act.

4.      The above-described action is a civil action over which this Court has original

jurisdiction under the provisions of 28 U.S.C. §1331, and is one that may be removed to this

Court by the Defendants/Petitioners pursuant to the provisions of 28 U.S.C. §1441(a), in that it is

a civil action based upon a federal question over which this Court has original jurisdiction.

5.      Any civil action filed in a state court may be removed by the defendant to federal court if,

the case could have been brought originally in federal court pursuant to 28 U.S.C. §1441(b)

(2007). To meet the requirements for diversity removal, the matter in controversy must exceed

$75,000, and the parties must be citizens of different or foreign states as provided by 28 U.S.C.

§1332.

6.     Accordingly, there is complete diversity of citizenship which invites removal to federal

court under 28 U.S.C. §§ 1441 and 1332(a).

7.     Removal is justified pursuant to 28 U.S.C. §§ 1331 and 1441(a). Federal questions are

raised because plaintiff alleges SLS violated the FDCPA. (*See* COMP. EX. B., Complaint, Count

I.) Whether a claim arises under federal law so as to confer federal question jurisdiction under §

1331 is governed by the well-pleaded complaint rule. Under this doctrine, "federal jurisdiction

exists . . . when a federal question is presented on the face of the plaintiff's properly pleaded

complaint." *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392 (1987).

8.     Claims for violation under the FDCPA are civil actions arising under the laws of the

United States and are therefore removable. *See Carolyn Boone v. JP Morgan Chase Bank, N.A.,*

*et al.,* 447 Fed. Appx. 961, 962 (11th Cir. 2011) (finding removal proper under federal question

jurisdiction where complaint alleged FDCPA violation).

9.     Plaintiff's complaint also includes a cause of action under the FCCPA, Fla. Stat. §

559.72(9). The FCCPA claim is based upon the same facts and circumstances as the FDCPA

claim. Because it is inextricably intertwined with, and forms part of the same case or controversy

as the FDCPA claim, this Court has supplemental jurisdiction over the FCCPA claim under 28

U.S.C. § 1367(a). *See City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 165 (1997)

(finding that district court may exercise supplemental jurisdiction over state law claims that

constitute "part of the same case or controversy" as claims arising under federal law);  *Design*

*Pallets, Inc.* v. *Gray Robinson, P.A.*, 583 F. Supp. 2d 1282, 1284 (M.D. Fla. 2008) (finding that

district court had supplemental jurisdiction over state law claims where it had subject-matter jurisdiction over federal claims).

10.     The Eleventh Circuit Court of Appeals released an opinion earlier this month that could give foreclosure lawyers cause for concern.  In Reese v. Ellis, Painter, Ratterree & Adams, LLP, No. 10-14366, 2012 WL 1500108 (11th Cir. May 1, 2012), the Eleventh Circuit ruled that a foreclosure firm conducting a foreclosure is liable under the Fair Debt Collection Practices Act ("FDCPA") for sending homeowners correspondence that includes false or misleading information.  This decision may call into question the protection that foreclosure firms and debt collector's that engage in deceptive collection activity.

11.     Therefore, in the Eleventh Circuit, the filing of a mortgage foreclosure action will constitute debt collection activity only when the complaint seeks also to collect on the note, that is, to "demand[s] payment on the underlying debt." See Reese, 678 F.3d at 1217.

12.     To illustrate, in Rotenberg v. MLG, P.A., 13-cv-22624-UU, 2013 WL 5664886 (S.D. Fla. Oct. 17, 2013), the defendant argued that its foreclosure complaint sought only to enforce a security interest, not to collect a debt.  The court disagreed, finding that because the defendant sought a deficiency judgment for the amount exceeding the collateral, the defendant did, indeed, seek to collect a debt:

> "Here, it is clear that Defendant was in part attempting to collect on the underlying debt, as the complaint sought a deficiency judgment, which by definition is granted only when proceeds from a foreclosure sale do not offset the amount owed on the underlying debt."

13.     Rotenberg, 2013 WL 5664886, at *2; see also Battle v. Gladstone Law Group, P.A., No.12-14458-CIV, 2013 WL 3297552, at *2 (S.D. Fla. June 28, 2013) (finding that the filing of

a foreclosure complaint seeking the enforcement of a promissory note constitutes debt collection

activity under the FDCPA).

14.    In *Glazer v. Chase Home Finance LLC*, No. 10–3416, January 14, 2013 - US 6th Circuit,

on appeal from the district court analyzed this issue for purposes of federal removal:

> "…Foreclosure's legal nature, therefore, does not prevent it from being debt
> collection... Thus, if a purpose of an activity taken in relation to a debt is to "obtain payment" of
> the debt, the activity is properly considered debt collection. Nothing in this approach prevents
> mortgage foreclosure activity from constituting debt collection under the Act. See Shapiro &
> Meinhold v. Zartman, 823 P.2d 120, 124 (Colo. 1992) (explaining that "foreclosure is a method
> of collecting a debt by acquiring and selling secured property to satisfy a debt").
>
> In fact, every mortgage foreclosure, judicial or otherwise, is undertaken for the very
> purpose of obtaining payment on the underlying debt, either by persuasion (i.e, forcing a
> settlement) or compulsion (i.e., obtaining a judgment of foreclosure, selling the home at auction,
> and applying the proceeds from the sale to pay down the outstanding debt). As one commentator
> has observed, the existence of redemption rights and the potential for deficiency judgments
> demonstrate that the purpose of foreclosure is to obtain payment on the underlying home loan.
>
> Such remedies would not exist if foreclosure were not undertaken for the purpose of
> obtaining payment.  See Eric M. Marshall, Note, The Protective Scope of the Fair Debt
> Collection Practices Act: Providing Mortgagors the Protection They Deserve From Abusive
> Foreclosure Practices, 94 Minn. L. Rev. 1269, 1297–98 (2010).
>
> Accordingly, mortgage foreclosure is debt collection under the FDCPA.
>
> Other provisions in the Act reinforce this view. The Act nowhere excludes from its reach
> foreclosure or the enforcement of security interests generally. In fact, certain provisions
> affirmatively suggest that such activity is debt collection. Section 1692f prohibits "debt
> collectors" from using "unfair or unconscionable means" to "collect any debt." After stating
> this general prohibition, the section sets forth a non-exhaustive list of specific activities
> prohibited thereunder, one of which is "[t]aking or threatening to take any nonjudicial action to
> effect dispossession or disablement of property" if, e.g., "there is no present right to possession
> of the property claimed as collateral through an enforceable security interest[.]" 15 U.S.C. §
> 1692f(6)(A).
>
> Foreclosure in some states is carried out in just this way—through "nonjudicial action,"
> the result of which is to "effect dispossession" of the secured property. See, e.g., Mich. Comp.
> Laws § 600.3204 (authorizing foreclosure by advertisement only if no lawsuit has been filed to
> recover the underlying debt); Tenn. Code Ann. § 35-5-101 (permitting foreclosure by
> advertisement). The example's presence within a provision that prohibits unfair means to
> "collect or attempt to collect any debt" suggests that mortgage foreclosure is a "means" to
> collect a debt."

15.    Plaintiff is clearly a debt collector within the meaning federal debt collection statute.

16.     Defendants sought to collect a debt from Plaintiff arising from an alleged debt incurred by Plaintiff for personal, family, or household purposes; more specifically, the debt at issue was allegedly incurred on a note and secured by a mortgage.  The latter is null and void and secures the former.

17.     Plaintiff issued note and mortgage in a party other than Defendant HSBC, however HSBC clamed the *note was lost, stolen or destroyed*.

18.     The Plaintiff has no contract with HSBC or ALDRIDGE CONNERS, LLP.

19.     The Plaintiff has no legal obligation to pay AMERICAN SERVICING COMPANY, HSB or ALDRIDGE CONNERS, LLP.

20.     Sometime thereafter and without notice to the Plaintiff, the Plaintiff's note and mortgage was sold one or more times without prior notice to the Plaintiff's as required under paragraph 15, 20 and 22 of the mortgage.

21.     Sometime thereafter and without proper notice to the Plaintiff, the Defendant HSBC, AMERICAN SERVICING COMPANY and ALDRIDGE CONNERS, LLP have engaged in collection activity against the Plaintiff.

22.     Thereafter, HSBC claimed that the note and mortgage are owed to them and filed for foreclosure; however the Plaintiff has not contract with Defendant HSBC.

23.     Because of said willful actions by HSBC, AMERICAN SERVICING COMPANY MORTGAGE LLC and AMERICAN SERVICING COMPANY the Plaintiff has lost property.

24.     The property is the Plaintiff's only home and where the Plaintiff resides with his family.

25.     Defendant in the complaint claimed that:

"All conditions precedent to the acceleration of this Mortgage Note and to foreclosure of the Mortgage have been fulfilled or have occurred."

This statement was false, misleading, and deceptive to the "least sophisticated consumer".

26.     Said foreclosure action was sent to the Plaintiff in an attempt to collect a debt.

27.     The FDCPA has been construed by Federal Courts as a strict liability statute that is to be construed liberally so as to effectuate its remedial purpose, to extinguish, among other things abusive, oppressive, deceptive, unfair and unconscionable collection practices in the collection of a debt. *Russell v. Equifax A.R.S.,* 74 F.3d 30, 33 (2d Cir. 1996).

28.     The Plaintiff did not receive foreclosure counseling as required under the National Housing Act (NHA), 12 U.S.C. 1701x (c)(5) which requires all private lenders servicing non-federally insured home loans to advise consumers, including the Plaintiff, of any home ownership counseling required, together with information about counseling offered by the U.S. Department Of Housing And Urban Development.

29.     Section 12 U.S.C. 1701x(c)(5) imposes a specific statutory obligation on all creditors across the United States who service conventional loans, (non federally-insured home loans) that requires the creditor to send a specific notice about access and availability of homeownership counseling to defaulting homeowners within 45 days of a home loan payment default.  The creditor is obliged to advise the homeowner of any homeownership counseling offered by the servicer of the loan and/or information about how to access HUD homeownership counseling.

30.     At no point in time were the Plaintiffs offered foreclosure counseling.  An unsophisticated consumer would be frustrated and would believe that this practice would be unfair.

31.     Defendant(s) sought to collect a debt from Plaintiff arising from an alleged debt incurred by Plaintiff for personal, family, or household purposes; more specifically, the debt at issue was allegedly incurred on a note and secured by a mortgage.  The latter is null and void and secures the former.

32.     The Plaintiff issued a note (Exhibit "A") and mortgage (Exhibit "B") to BANK UNITED.

33.     Sometime thereafter and without notice to the Plaintiff, BANK UNITED endorsed the note and assigned the mortgage to one or more parties.

34.     Due to the securitization of the Plaintiff's note by BANK UNITED, there at least three assignments of mortgage missing and the Defendants did not produce a complete chain of endorsements and allonges and cannot produce a clear chain of custody for the note and mortgage because securitized mortgages and notes are required to be four transactions removed from the originator pursuant to Internal Revenue Service 860 A-G..

35.     The foreclosure complaint was filed by the ALBERTELLI LAW, P.A., and law office renown for foreclosure on hundreds of thousands of Florida homes without proper notification.

36.     Because of said willful actions by CARRINGTON MORTGAGE SERVICES and their lack servicing of the loan, the Plaintiff has been damaged.

37.     The Plaintiff has not received the proper "hello" and "good-bye" letters as required by law and has not received a proper notice of default form the lender.  The Plaintiff has not received a proper notice of acceleration from the lender.

38.     Allegedly, the note and mortgage was sold to one or more parties without proper notice and securitized the CHRISTIANA TRUST, A DIVISION OF WILMINGTON SAVINGS FUND SOCIETY, FSB, AS TRUSTEE FOR TRUSTEE FOR STANWICH MORTGAGE LOAN TRUST, SERIES 2012-19 however, securitization requires four or more assignments which are missing from the state foreclosure case.  The Defendants cannot prove a clear chain of title of the note and mortgage.

39.     The Defendant FCI LENDER SERVICES, INC is a debt collector and failed to yield to conditions precedent to foreclose.  The Plaintiff has not received a hello or good-bye letter from

FCI LENDER SERVICES, INC despite the fact GLEN GARRON, LLC and attorney LENDER

LEGAL SERVICES, LLC stated that FCI LENDER SERVICES, INC was Plaintiff's servicer

(Exhibit "C" purported notice of default).  This information was concealed from the Plaintiff.

The Plaintiff was deceived.

40.     TODD PETER controls the actions of GLEN GARRON, LLC as the manager.

41.      The Defendant ALBERTELLI LAW, P.A. engaged in unlawful debt collection against

the Plaintiff but failed to provide the requisite notices to the Plaintiff.

42.     Despite the unlawful sloppy egregious and defective collection activities of the

Defendants was oppressive, abusive and unfair to the Plaintiff and the Plaintiff has suffered

damages.

43.     The Defendants conspired to breach the Plaintiff's mortgage which requires proper

notices from services of the mortgage and note and proper chain of title.

44.     GLEN GARRON, LLC and ALBERTELLI LAW, P.A. have continued in their collection

and have so far refused to correct the aforementioned.

45.     The property is the Plaintiff only home and where the Plaintiff resides.

46.     Defendant in the complaint claimed that:

> "All conditions precedent to the acceleration of this Mortgage Note and to
> foreclosure of the Mortgage have been fulfilled or have occurred."

This statement was false, misleading, and deceptive to the "least sophisticated consumer".


47.     Said foreclosure action was sent to the Plaintiff in an attempt to collect a debt.

48.     The Plaintiff did not receive foreclosure counseling as required under the National

Housing Act (NHA), 12 U.S.C. 1701x (c)(5) which requires all private lenders servicing non-

federally insured home loans to advise consumers, including the Plaintiff, of any home

ownership counseling required, together with information about counseling offered by the U.S. Department Of Housing And Urban Development.

49.     Section 12 U.S.C. 1701x(c)(5) imposes a specific statutory obligation on all creditors across the United States who service conventional loans, (non federally-insured home loans) that requires the creditor to send a specific notice about access and availability of homeownership counseling to defaulting homeowners within 45 days of a home loan payment default.  The creditor is obliged to advise the homeowner of any homeownership counseling offered by the servicer of the loan and/or information about how to access HUD homeownership counseling.

50.     At no point in time were the Plaintiffs offered foreclosure counseling.  An unsophisticated consumer would be frustrated and would believe that this practice would be unfair.

51.     GLEN GARRON, LLC, TODD PETER, BANK UNITED, LENDER LEGAL SERVICES, LLC, JOSEPH TOWNE, and individual, FCI LENDER SERVICES, INC. CARRINGTON MORTGAGE SERVICES, LLC, CHRISTIANA TRUST, A DIVISION OF WILMINGTON SAVINGS FUND SOCIETY, FSB, AS TRUSTEE FOR TRUSTEE FOR STANWICH MORTGAGE LOAN TRUST, SERIES 2012-19, BY LLC, ALBERTELLI LAW, P.A. and ERIN MAE ROSE QUINN engaged in tortious interference of the Plaintiff's contract.

52.     The Plaintiff has no contract with these parties and the parties have failed to prove how the Plaintiff owes these parties any money.

53.     The Plaintiff contract does not contain or allow for the acceleration of the debt, allegedly due, unless Defendant has fulfilled the condition precedent of notices pursuant the mortgage contract *prior to filing suit*.  By failing to give the requisite notification before filing suit,

Defendant has no right to accelerate.  An unsophisticated consumer would believe that this act would be deceptive and unfair.

54.     Therefore BANK UNITED, LENDER LEGAL SERVICES, LLC, FCI LENDER SERVICES, INC. CARRINGTON MORTGAGE SERVICES, LLC, CHRISTIANA TRUST, A DIVISION OF WILMINGTON SAVINGS FUND SOCIETY, FSB, AS TRUSTEE FOR TRUSTEE FOR STANWICH MORTGAGE LOAN TRUST, SERIES 2012-19, BY LLC were not the legal owner of the note upon filing of said foreclosure complaint.

55.     The Defendant GLEN GARRON, LLC and ALBERTELLI LAW, P.A. collection of attorneys' fees is deceptive and unjustified.

56.     The chain of assignments and/or endorsements of the Note are broken and neither the Defendant GLEN GARRON, LLC, BANK UNITED, LENDER LEGAL SERVICES, LLC, FCI LENDER SERVICES, INC. CARRINGTON MORTGAGE SERVICES, LLC, CHRISTIANA TRUST, A DIVISION OF WILMINGTON SAVINGS FUND SOCIETY, FSB, AS TRUSTEE FOR TRUSTEE FOR STANWICH MORTGAGE LOAN TRUST, SERIES 2012-19, BY LLC or ALBERTELLI LAW, P.A. have provided notices of assignments and endorsements as required under the mortgage contract.

57.     There is no assignment at all to GLEN GARRON, LLC.

58.     Florida Statutes §559.715 requires an assignment of mortgage upon assignment of all consumer debts.

59.     Defendants GLEN GARRON, LLC, TODD PETER, BANK UNITED, LENDER LEGAL SERVICES, LLC, JOSEPH TOWNE, and individual, FCI LENDER SERVICES, INC. CARRINGTON MORTGAGE SERVICES, LLC, CHRISTIANA TRUST, A DIVISION OF WILMINGTON SAVINGS FUND SOCIETY, FSB, AS TRUSTEE FOR TRUSTEE FOR

STANWICH MORTGAGE LOAN TRUST, SERIES 2012-19, BY LLC, ALBERTELLI LAW, P.A. and ERIN MAE ROSE QUINN have an established pattern and practice of engaging in illegal debt collection practices and in fact engages and uses false representation to collect, or attempt to collect, a debt. The Defendant, ALBERTELLI LAW, P.A., knew or should have known that their acts and the acts of their client were unlawful and contrary to the spirit of the fairness.

60.    Upon close review of case documentation submitted by Defendant, GLEN GARRON, LLC and ALBERTELLI LAW, P.A., numerous errors in their lawsuit are elevated due to an obvious lack of consistency. Those errors, made jointly and individually on the part of Defendant's legal counsel, ALBERTELLI LAW, P.A., were fatal to their debt collection efforts and harmed the Plaintiff.

61.    In accordance with Fla. Stat. 559.715 (2009), an assignee of a Mortgage and Note must give the debtor written notice of such assignment within thirty (30) days after the assignment. Plaintiffs have never received such a notice.

62.    Again, the Defendant(s) violated federal and state law by failing to send the Plaintiff a hello letter, a good-by letter, failing to observe notification requirements under the mortgage contract and failing to send the Plaintiff an assignment within 30 days of the sale of the note or mortgage.

63.    A Servicing Transfer Statement is required if the loan servicer sells or assigns the servicing rights to a borrower's loan to another loan servicer. The loan servicer must notify the borrower fifteen (15) days before the effective date of the loan transfer pursuant to 24 C.F.R. § 3500.21 (d). The Defendant(s) failed to provide such notices one or more times.

64.     All Defendant(s) conspired and acted in continuing collection activities without lawful authority to do so.

65.     Plaintiff alleges that the Defendant(s) engaged in unlawful collection practices and have established common patterns and practices as more fully described hereto in attempting to collect a consumer related debt.

66.     Defendant GLEN GARRON, LLC and ALBERTELLI LAW, P.A. failed to properly supervise his employees, agents and debt collectors.

67.     GLEN GARRON, LLC has **overseen the violations of FDCPA** and has chosen to ignore its responsibilities in rectifying these problems.

68.     ALBERTELLI LAW, P.A. and GLEN GARRON, LLC have **overseen the violations of FDCPA** and have chosen to ignore responsibilities in rectifying these problems.

69.     Defendant GLEN GARRON, LLC continues to use the services of ALBERTELLI LAW, P.A., PA despite having knowledge of the Defendant(s)' flagrant disregard for due process and collection laws.

70.     There are willful breaches of the mortgage contract.

71.     The Plaintiff has suffered for years of litigations and the unconscionable debt collection actions of the Defendant(s) for several years.

72.     Plaintiff alleges that these calls were unlawful, done to harass the Plaintiff and in violation of clearly established state and federal law.

73.     All conditions precedent to the bringing of this action have been performed, waived or excused.

74.     Rather than dismiss the State Court lawsuit for foreclosure and debt collection, Defendant(s) continued to litigate the matter forcing Plaintiff and the Court to incur additional time and expense despite the obvious inconsistency in their actions and deceptive acts.

75.     Plaintiff maintains that Defendants' attempt to collect the alleged debt, including but not limited to the large volume of telephone calls, was unlawful as Plaintiff has neither gave verbal or written notice to Defendants that he did not owe them any money.

76.     The Defendants BANK UNITED, LENDER LEGAL SERVICES, LLC, CARRINGTON MORTGAGE SERVICES, LLC, and CHRISTIANA TRUST, A DIVISION OF WILMINGTON SAVINGS FUND SOCIETY, FSB, AS TRUSTEE FOR TRUSTEE FOR STANWICH MORTGAGE LOAN TRUST, SERIES 2012-19, BY LLC were sent Cease and Desist letters but have failed to observe federal law and have not ceased collection activity.

77.     Defendants GLEN GARRON, LLC, TODD PETER, LENDER LEGAL SERVICES, LLC have all received a Request for accounting and have failed to answer.

78.     The Defendants GLEN GARRON, LLC, TODD PETER, LENDER LEGAL SERVICES, LLC have received a notice of dispute (Exhibit "F") and have failed to observe the applicable law.

79.     That Defendant either willfully or knowingly violated the FDCPA.

80.     That Defendant either willfully or knowingly violated the FCCPA.

81.     The acts of the Defendant(s) in their attempt to collect on this debt are nonsensical to the least educated consumer, sloppy, confusing, unconscionable and lack legal basis.

82.     The acts of the Defendants were not consistent with the state court complaint.

83.     All conditions precedent to the bringing of this action have been performed, waived or excused.

84.     Rather than dismiss the State Court lawsuit for foreclosure and debt collection, Defendants continued to litigate the matter forcing Plaintiff and the Court to incur additional time and expense despite the obvious inconsistency in their actions and deceptive acts.

85.     The acts of the Defendants in their attempt to collect on this debt are nonsensical to the least educated consumer, sloppy, confusing, unconscionable and lack legal basis.

86.     The Defendants have deceived the Plaintiff and engaged in a pattern and practice of unfair and deceptive collection practices.

87.     Exceptions from the term "debt collector" do not include any person attempting to collect "*any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was **not in default** at the time it was obtained by such person.*" *15 U.S.C. § 1692a(6)(F)(iii).*

88.     Plaintiff is a debt collector and one without a specific alleged right to collect the debt.

89.     Plaintiff, a debt collector bringing any legal action on a debt against any consumer in the case of an action to enforce an interest in real property securing the consumer's obligation, bring such action only in a judicial district or similar legal entity in which such real property is located. 15 U.S.C. § 1692i.

> "*§ 1692a. Definitions…*
>
> *(6) The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or  due another. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.  For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate*

*commerce or the mails in any business the principal purpose of which is the enforcement of security interests.*"

90.     The FDCPA defines a "debt collector" by exception of the term "debt collector" does not include any person attempting to collect "*any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was **not in default** at the time it was obtained by such person.*" *15 U.S.C. § 1692a(6)(F)(iii).*

91.     Plaintiff's identification of itself as subsequent assignee is a euphemism for third party debt collector under the FDCPA and one without a specific alleged right to collect the debt.

92.     The Florida Supreme Court decided *Georgia Cas. Co. v. O'Donnell* on March 24, *1933*, decades prior to securitized and collateralized debt obligations.  In 1933 a mortgage was a mortgage.

93.     In *Georgia Cas. Co. v. O'Donnell*, the Florida Supreme Court primary issue entertained was the question of "*whether the circuit court of Dade county, Florida had jurisdiction to entertain a suit for the foreclosure of a mortgage on lands lying wholly within Liberty county Florida.*"  147 So. 267.

94.     The trial court dismissed the bill of foreclosure against O'Donnell on the grounds of violation of the local action rule of the *quasi in rem* proceeding.

95.     The appellate and Supreme Courts affirmed stating the action could not be brought outside of the county where the land was situated.

96.     The justices in this case, at page 268, cited by the Honorable Court in the *Order Requiring Amended Notice of Removal*, page 1, ¶ 2, ruled that "*The method of foreclosure in this state is to have the mortgaged property sold under an order of the court and the proceeds applied in payment of the mortgage debt.*"

97.     In Florida in 1933, the foreclosing party was the actual lender and not a several times removed third party debt collector.

98.     Presently, Plaintiff, a securitization trust, alleges no contract with ROZIER.

99.     Plaintiff identifies itself neither as the lender, beneficiary, nor even as the institutional investor identified by the MERS MIN registry system, BANK OF AMERICA, National Association, "*BOA*."

100.    Plaintiff's allegations identify it as nothing more than a third party debt collector.

101.    Similar to the facts in the *Glazer v. Chase Home Finance LLC*, Plaintiff has no specific fact allegations of the chain of endorsement and delivery of the Note.

102.    Similar to the facts in the *Glazer v. Chase Home Finance LLC*, Plaintiff has no specific fact allegations of the Assignment of the Mortgage.

103.    Plaintiff's Complaint is not a well-pleaded foreclosure claim, but is a debt collection claim under the FDCPA.

104.    Plaintiff's activities are not alleged to be those of a simple creditor foreclosing on a purchase money loan under *Georgia Cas. Co. v. O'Donnell*.

105.    The provisions of the Florida statutes for lender foreclosure cannot reach the activities of Plaintiff, a federally regulated entity required to demonstrate compliance with federal securities, tax and debt collection law, as well as its own federal securities contracts all of which are material in Plaintiff's attempt to collect a debt claim.

106.    Conversely, as shown, the state claim on its face is far from well-pleaded.

107.    The complaint contains no express affirmative allegations, made at the time the proceeding was commenced, that Plaintiff was the holder of the *original* Note secured by the mortgage.

108.   With regard to the original Note and Mortgage, Plaintiff alleges vaguely:

*"Plaintiff is entitled to enforce the Note and Mortgage, pursuant to F.S. § 673.3011...."*

109.   This claim is deceptive and not properly before the court or the Defendant.

110.   There is also a conflict between the foreclosure statute cited by Plaintiff and the FDCPA.

111.   Under Florida law, a person may be a person entitled to enforce the instrument, that is collect the debt, even though the person is *not* the owner of the instrument or is *in wrongful possession of the instrument.*

112.   Further defects in alleging a single count of the state claim for foreclosure is the failure by Plaintiff to allege the delegated authority to institute a mortgage foreclosure action on behalf of the person entitled to enforce the note, as required under Florida foreclosure law.

113.   The Complaint has no description of Plaintiff's authority and fails to identify, with specificity, the **document** that grants the plaintiff the authority to act on behalf of the person entitled to enforce the note, as required under Florida foreclosure law.

114.   There is actually no specific fact allegation that Plaintiff is the holder of, and entitled to collect, under the Note, as required under Florida foreclosure law.

115.   In fact, under the pleading rules for Florida foreclosure complaints, Plaintiff, *if* in possession of the original promissory note, was required to file under penalty of perjury, a certification with the court, contemporaneously with the filing of the complaint for foreclosure that the plaintiff is in possession of the original promissory note.

116.   The certification must to set forth the location of the note, the name and title of the individual giving the certification, the name of the person who personally verified such possession, and the time and date on which the possession was verified.

117.   Correct copies of the note and all allonges to the note must be attached to the certification.

118.    There was *no certification* whatsoever filed by the Plaintiff.

119.    Such failure is an admission by omission, that Plaintiff is not the Note holder.

120.    The Complaint also lacks the state statute required initial disclosure of status and pertinent facts alleging authority respecting the "original note" or "original promissory note," meaning the signed or executed promissory note rather than a copy thereof.

121.    On these various grounds, the Complaint cannot be deemed to be a well-pleaded state claim for foreclosure, as required under the Florida foreclosure statute or for review on removal. *F.S. 702.015.*

122.    Plaintiff's allegations identify it as nothing more than a third party debt collector.

123.    Plaintiff is neither lender to, nor in any contract with the Defendant.

124.    Similar to the facts in the *Glazer v. Chase Home Finance LLC*, Plaintiff has no specific fact allegations of the chain of endorsement and delivery of the Note, nor specific fact allegations of Assignment of the Mortgage.

125.    Federal-question jurisdiction is usually invoked by plaintiffs pleading a cause of action created by federal law, but this Court has also long recognized that such jurisdiction will lie over some state-law claims that implicate significant federal issues, see, *e.g.*, *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180. The Plaintiff in this case engages in unlawful and deceptive collection activity.

126.    Federal jurisdiction is warranted in this recognized federal issue of debt collection styled as a foreclosure.

127.    In the instance, where the debt collector is a federally regulated securitization trust, with a history of failed entities, mergers, transfers, missed cut-off transfer dates, insurance pay-outs, missing assignments, and no specific allegation of where the alleged debt instrument, the Note, is

actually held, or by whom, the issue is a substantial one where Federal jurisdiction is properly exercised and warranted.

128.    The jurisdiction is to be consistent with congressional judgment about the sound division of labor between state and federal courts governing application of the statute.

129.    Plaintiff is not a creditor prosecuting a state foreclosure of its security interest in the alleged debt.

130.    Plaintiff has no record of clear chain of assignments of Mortgage or endorsements and delivery of the Note.

131.    As the securitization trustee, its Complaint only specifically alleges that it seeks to collect a debt, somehow.

132.    Plaintiff's federal debt collection is covered by a seeming state law claim.

133.    The foreclosure necessarily states a federal issue, actually disputed and substantial, which a federal forum may "*entertain without disturbing a congressionally approved balance of federal and state judicial responsibilities.*"

134.    This case warrants federal jurisdiction.

## VIOLATION TO NATIONAL HOUSING ACT

135.    The National Housing Act, 12 U.S.C. 1710(a) imposes specific statutory obligations on all creditors across the United States who service federally-insured home loans that require the creditor to engage in very specialized default loan servicing and loss mitigation to avoid foreclosure when a borrower defaults on a home loan insured by the federal government for reasons beyond their control.  The creditor is fully insured in exchange for agreeing to abide by these customer servicing obligations.

136.     Compliance with the default loan servicing federal regulations promulgated by HUD, pursuant to the National Housing Act, 12 U.S.C. 1710(a) can be held to be a contractual condition precedent to instituting a foreclosure action and the failure of the Plaintiff to implement foreclosure avoidance servicing is an appropriate subject for a counterclaim for declaratory and injunctive relief.  See: U.S. v. Trimble, 86 F.R.D. 435 (S.D. Fla. 1980) and Cross v. Federal National Mortgagee Association, 359 So. 2d 464, 465 (Fla. 4th DCA 1978): "A mortgage foreclosure is an equitable action and thus equitable defenses are most appropriate [I]t appears to us that given the purpose of ... the recommended efforts to obviate the necessity of foreclosure, any substantial deviation from the recommended norm might be construed by the trial court under the heading of an equitable defense." Id., 359 So. 2d at 465.  (also see U.S. v. Trimble, 86 F.R.D. 435 (S.D. Fla. 1980), where the court found that compliance with applicable federal laws can be upheld as equitable defense to deny a creditor the judicial remedy of foreclosure.)

137.     Plaintiff must show that it has federal authority to foreclose and that it complied with the pre-foreclosure default prevention procedures.  Plaintiff has not shown that it owns the Note and the Mortgage and has affirmatively stated in its Complaint that no assignments exist.

138.     There are certain required steps a servicer of a loan must do before foreclosing, which are set forth in 24 CFR 203.604 and 24 CFR 203.605 for FHA loans and other provisions for other types of federally backed loans.

139.     Here the Plaintiff has failed to allege compliance with the NATIONAL HOUSING ACT.

**Venue**

140.     Venue is proper in this Court pursuant to 28 USC 1441(a) and 1446(b) because the UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, is

the federal judicial district or similar entity embracing THE CIRCUIT COURT OF THE

SEVENTEENTH JUDICIAL CIRCUIT OF FLORIDA IN AND FOR BROWARD COUNTY

GENERAL JURISDICTION DIVISION, where the State Court Action was originally filed.

<b>Amount in Controversy</b>

141.    An action to enforce any liability created by the Consumer Protection Act, and

amendment by the Fair Debt Collection Practices Act, may be brought in any appropriate United

States district court without regard to the amount in controversy, within one year from the date

on which the violation occurs.  The Complaint alleges damages of **$241,656.16**.an amount in

excess of the jurisdictional limit of the Court which is $75,000.00.

142.    The Plaintiff's State Court action may be properly removed to this Court.

<b><u>CERTIFICATION OF SERVICE</u></b>

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent to the Plaintiff's
attorney by U.S.mail.

JOSEPH TOWNE, Esq.
Florida Bar No. 0085526
Lender Legal Services, LLC
201 East Pine Street, Suite 730
Orlando, Florida 32801
Attorney for Plaintiff

*[signature]* 10/1/14
Frederick S. Blum
9085 S.W. 20th St.
Boca Raton, FL 33428

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA
CIVIL ACTION

BANKUNITED, SUCCESSOR IN INTEREST TO
BANKUNITED, F.S.B.,

        Plaintiff,

vs.

FREDERICK S. BLUM; THE UNKNOWN SPOUSE OF FREDERICK S. BLUM; RIVER OAKS OF PALM
BEACH COUNTY HOMEOWNERS ASSOCIATION, INC.; ANY AND ALL UNKNOWN PARTIES
CLAIMING BY, THROUGH, UNDER, AND AGAINST THE HEREIN NAMED INDIVIDUAL
DEFENDANT(S) WHO ARE NOT KNOWN TO BE DEAD OR ALIVE, WHETHER SAID UNKNOWN
PARTIES MAY CLAIM AN INTEREST AS SPOUSES, HEIRS, DEVISEES, GRANTEES, OR OTHER
CLAIMANTS; TENANT #1, TENANT #2, TENANT #3, and TENANT #4 the names being fictitious to
account for parties in possession

        Defendant(s).
_____/

CASE NO.:

DIVISION: 50 2010 CA 003287 XXXX MB

## MORTGAGE FORECLOSURE COMPLAINT

    Plaintiff, BankUnited, successor in interest to BankUnited, F.S.B., sues Defendants, Frederick S. Blum;
The Unknown Spouse of Frederick S. Blum; River Oaks of Palm Beach County Homeowners Association, Inc.;
Any and All Unknown Parties Claiming By, Through, Under, and Against the Herein Named Individual
Defendant(s) Who Are Not Known to be Dead or Alive, Whether Said Unknown Parties May Claim an Interest as
Spouses, Heirs, Devisees, Grantees, or Other Claimants; Tenant #1, Tenant #2, Tenant #3, and Tenant #4, the
names being fictitious to account for parties in possession, and alleges:

### COUNT I - MORTGAGE FORECLOSURE

    1.    This is an in rem action to foreclose a mortgage on real property located and situated in Palm
Beach County, Florida.

    2.    On January 26, 2007, there was executed and delivered a Promissory Note ("Mortgage Note") and
a Mortgage ("Mortgage") securing the payment of the Mortgage Note. The Mortgage was recorded on February 1,
2007, in Official Records Book 21365 at Page 0615 of the Public Records of Palm Beach County, Florida, (All
subsequent recording references are to the public records of Palm Beach County, Florida) and mortgaged the real
and personal property ("Property") described therein, then owned by and in possession of the Mortgagor(s). Copies
of the original Mortgage Note and Mortgage are attached hereto and incorporated herein as an Exhibit.

    3.    Plaintiff now owns and holds the Mortgage Note and Mortgage.

    4.    The Property is now owned of record by Defendant(s), Frederick S. Blum.

    5.    The Mortgage Note and Mortgage are in default. The required installment payment of April 1,
2009, was not paid, and no subsequent payments have been made. The Mortgage is contractually due for the April

1, 2009 payment. The last payment received was applied to the March 1, 2009 installment, and no subsequent payments have been applied to the loan.

6.       Plaintiff declares the full amount payable under the Mortgage Note and Mortgage to be now due.

7.       Plaintiff must be paid $241,871.81 in principal on the Mortgage Note and Mortgage, together with interest from March 1, 2009, late charges, and all costs of collection including title search expenses for ascertaining necessary parties to this action and reasonable attorney's fees.

8.       All conditions precedent to the acceleration of the Mortgage Note and foreclosure of the Mortgage have been performed or have occurred.

9.       Plaintiff has retained the law firm of Albertelli Law in this action and is obligated to pay it a reasonable fee for its services in bringing this action as well as all costs of collection.

10.      The interests of each Defendant are subject, subordinate, and inferior to the right, title, interest, and lien of Plaintiff's Mortgage with the exception of any special assessments that are superior pursuant to Florida Statutes 159, and/or 170.9.

11.      Frederick S. Blum may have or claim an interest in the Property that is the subject of this Foreclosure action by virtue of a Quit Claim Deed recorded in Official Records Book 6377, Page 678; a Final Judgment of Dissolution of Marriage recorded in Official Records Book 10881, Page 118; a Warranty Deed recorded in Official Records Book 10803, Page 937, or may otherwise claim an interest in the Property.

12.      River Oaks of Palm Beach County Homeowners Association, Inc. may have or claim an interest in the Property that is the subject of this Foreclosure action by virtue of a Claim of Lien recorded in Official Records Book 23189, Page 614; a Lis Pendens recorded in Official Records Book 23431, Page 1759, or may otherwise claim an interest in the Property.

13.      The Unknown Spouse of Frederick S. Blum may have or claim an interest in the Property that is the subject of this Foreclosure action by virtue of homestead rights, possession, or any right of redemption, or may otherwise claim an interest in the Property.

14.      Tenant #1, Tenant #2, Tenant #3 and Tenant #4, the names being fictitious to account for parties in possession may claim some interest in the Property that is the subject of this foreclosure action by virtue of an unrecorded lease or purchase option, by virtue of possession, or may otherwise claim an interest in the Property. The names of these Defendants are unknown to the Plaintiff.

WHEREFORE, Plaintiff requests that the Court ascertain the amount due Plaintiff for principal and interest on the Mortgage Note and Mortgage and for late charges, abstracting, taxes, expenses and costs, including attorney's fees, plus interest thereon; that if the sums due Plaintiff under the Mortgage Note and Mortgage are not paid immediately, the Court foreclose the Mortgage and the Clerk of the Court sell the Property securing the indebtedness to satisfy Plaintiff's mortgage lien in accordance with the provisions of Section 45.031, Florida Statutes (1999); that the rights, title and interest of any Defendant, or any party claiming by, through, under or against any Defendant named herein or hereafter made a Defendant be forever barred and foreclosed; that the Court appoint a receiver of the Property and of the rents, issues, income and profits thereof, or in the alternative, order sequestration of rents, issues, income and profits pursuant to Section 697.07, Florida Statutes (1995); and that the Court retain

jurisdiction of this action to make any and all further orders and judgments as may be necessary and proper, including the issuance of a writ of possession and the entry of a deficiency decree, when and if such deficiency decree shall appear proper, if borrower(s) has not been discharged in bankruptcy.

<u>COUNT II – RE-ESTABLISHMENT OF NOTE</u>

15.     This is an action to re-establish a lost Mortgage Note pursuant to Section 673.3091, Florida Statutes.

16.     Defendant(s) herein above-named, is/are affected by this action.

17.     On January 26, 2007, there was executed and delivered a Promissory Note ("Mortgage Note") to BankUnited, FSB. (See attached, a copy of the substantial terms of the note.)

18.     The terms of the Note are as follows:

      a.      Original loan amount: $ 240,000.00

      b.      Amount of monthly principal and interest payment: $1,005.39

      c.      Interest rate: 7.500%

      d.      Loan beginning date:  January 26, 2007

      e.      Loan maturity date:  February 1, 2037

19.     Plaintiff owns the Mortgage Note and is entitled to enforce said Mortgage Note.

20.     At some time between January 26, 2007, and the present, the Mortgage Note has either been lost or destroyed and the Plaintiff is unable to state the manner in which this occurred.  The Mortgage Note is not now in the custody and control of the Plaintiff.

21.     *The Plaintiff and the Defendants named herein are the only persons known to Plaintiff to have an interest for or against the re-establishment of the Mortgage Note.*

22.     Plaintiff was in possession of the Mortgage Note and entitled to enforce it when loss of possession occurred or Plaintiff has been assigned the right to enforce the Mortgage Note.

23.     The Mortgage Note has been destroyed or lost. After due and diligent search, Plaintiff has been unable to obtain possession of the Mortgage Note.

24.     The Mortgage Note has not been seized or transferred by Plaintiff.

WHEREFORE, Plaintiff requests that the Court re-establish the Mortgage Note which this Mortgage secures.

Albertelli Law
P.O. Box 23028
Tampa, Florida 33623
(813) 221-4743

By:

RYAN J. WEEKS, ESQ.
FLORIDA BAR NO. 57897

Erin M. Rose Quinn, Esq.
FL Bar No. 64446

DL - 10-31245

# BankUnited

## Adjustable Rate Note
### (5-Year Select Monthly ARM)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT, AND MY PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED. BOTH MY MAXIMUM INTEREST RATE AND MINIMUM INTEREST RATE ARE LIMITED. MY INITIAL REQUIRED MONTHLY PAYMENT AMOUNT WILL NOT BE SUFFICIENT TO PAY THE INTEREST THAT ACCRUES UNDER THIS NOTE. THE PRINCIPAL BALANCE OF THIS NOTE MAY INCREASE TO AN AMOUNT THAT IS LARGER THAN THE AMOUNT THAT I ORIGINALLY BORROWED.

| January 26, 2007 | ROYAL PALM BEACH | Florida |
|---|---|---|
| [Date] | [City] | [State] |

9085 C SW 20TH STREET
BOCA RATON, FL  33428

[Property Address]

1. **BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 240,000.00 plus any amounts added in accordance with Section 3(D) of this Note (this amount is collectively called "Principal"), plus interest, to the order of Lender. Lender is **BankUnited, FSB**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

2. **INTEREST**

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **7.5000** %. The interest rate I will pay will change as provided in this Section 2.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Change Dates**

The interest rate I will pay may change on the first day of **February 2012** and on that same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".

**(C) Interest Rate Limits**

My interest rate will never be greater than **10.9500** %. My interest rate will never be less than the amount of the then applicable Margin described in Section 2(E) below.

**(D) Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the twelve-month average of the monthly yields (the "Monthly Yields") on actively traded non-inflation-indexed United States Treasury securities adjusted to a constant maturity of one year as published by the Board of Governors of the Federal Reserve System in Federal Reserve Statistical Release H.15, which is entitled "Selected Interest Rates". The twelve-month average is determined by adding together the Monthly Yields for the most recently available twelve months, dividing that sum by 12, and then rounding the resulting number to four decimal places. The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."

Multistate Adjustable Rate Note – (5-Year Select Monthly ARM)                                           la-872617 v6

MFCD5091                          Page 1of 6          000515269-9          Initials: _____

If the Index, or any substitute Index, is no longer available, the Note Holder will choose a new Index which is based upon comparable information.  The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and One Quarter** percentage points ( **3.2500** %) (the "Margin") to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one-percentage point (0.125%).  Subject to the limits stated in Section 2(C) above, the rounded amount will be my new interest rate, which will become effective on the Interest Change Date.  That interest rate will remain in effect until the next Interest Change Date.

In the event a new Index is selected in accordance with Section 2(D) above, a new Margin may be established.  The new Index and Margin will result in an interest rate that is substantially similar to the interest rate that was in effect at the time that the old Index became unavailable.

3.   **PAYMENTS**

**(A) Time and Place of Payments**

I will make my monthly payments on the first day of every month, beginning on **March 2007** .  I will make a payment every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on **February 01, 2037** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make monthly payments at   **7815 NW 148 ST., MIAMI LAKES, FL. 33016**

or at a different place if required by the Note Holder.

**(B) Monthly Payments During the Initial Five Year Period**

My initial monthly payments will be in the amount of U.S. $              **1,005.39** .
These monthly payments are equal to the amount that would be sufficient to repay the initial Principal, together with interest at the rate of              **2.9500** %, in full in substantially equal monthly installments through the Maturity Date.  The rate used to calculate these monthly payments is lower than the initial interest rate stated in Section 2(A) above.  The Note Holder's monthly billing statement may disclose other payment options that I may have, if I should wish to pay a monthly payment that is larger than the required amount.

The amount of my initial monthly payment will change as provided in this Section 3.

**(C) Monthly Payments During the Remaining Term of this Note**

My monthly payment can change on the due date of my sixty-first (61st) payment, which is due on              **March 2012** , and on that same day every twelfth (12th) month thereafter.  Each of these dates is called a "Payment Change Date."  On each Payment Change Date, my monthly payment will change to the amount that would be sufficient to repay the Principal that I am expected to owe on the Payment Change Date, together with interest at the rate in effect during the preceding month, in full in substantially equal monthly installments through the Maturity Date.  However, unless Section 3(E) or Section 3(F) below applies, the amount of my new monthly payment, beginning on each Payment Change Date, will be limited to an amount that is no more than 7 1/2% greater than the monthly payment I am required to pay under this Note immediately prior to that Payment Change Date.  The Note Holder's monthly billing statement may disclose other payment options that I may have, if I should wish to pay a monthly payment that is larger than the required amount.

I will pay the amount of my new monthly payment each month, beginning on each Payment Change Date, until the next Payment Change Date, unless my monthly payments are changed earlier as provided in Section 3(E) below.

**(D) Changes in My Unpaid Principal**

My initial required monthly payment amount will not be sufficient to pay the interest that will accrue under this Note at the initial interest rate stated in Section 2(A) of this Note.  In addition, since (after the first Payment Change Date) my monthly payment amount changes less frequently than the

interest rate, and since my monthly payment is subject to the payment limitations described in Section 3(C) above, my subsequent monthly payments could be lesser or greater than the amount sufficient to pay the interest that will accrue at the interest rates that are in effect under this Note from time to time. For each month that my monthly payment is less than the interest that accrues under this Note, the Note Holder will subtract the monthly payment from the amount of the accrued interest and will add the difference to my unpaid Principal, and additional interest will accrue on the amount of this difference at the interest rate that is in effect under this Note from time to time.  For each month that the monthly payment is greater than the interest that accrues under this Note, the Note Holder will apply the excess towards a Principal reduction of this Note.

**(E)  Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to 115% of the original Principal of this Note.  In the event my unpaid Principal would otherwise exceed that 115% limitation on a monthly payment due date, I will begin paying a new monthly payment on that monthly payment due date, and will continue to make this payment each month until the next Payment Change Date, subject at all times to a further increase in my monthly payment under this Section 3(E) if my unpaid Principal would again otherwise exceed the 115% limitation.  My new monthly payment will be the amount that would be sufficient to repay the unpaid Principal I am expected to owe on the monthly payment due date, together with interest at the rate in effect during the month prior to the monthly payment due date, in full in substantially equal monthly installments through the Maturity Date.

In each case, the new monthly payment will be determined without applying the 7 1/2% payment limitation described in Section 3(C) above.

**(F)  Required Full Monthly Payment**

On the first Payment Change Date, on each fifth (5 th) Payment Change Date thereafter, and on the final Payment Change Date, my monthly payment will be determined without regard to the 7 1/2% payment limitation described in Section 3(C) above.

**4.      NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me, and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.      BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment".  If I make a Prepayment of the entire Principal balance that I owe under this Note, this is called a "full Prepayment."  If I make a Prepayment of less than the entire Principal balance that I owe under this Note, this is called a "partial Prepayment."  When I make a full Prepayment or a partial Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge.  The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of this Note.  If I make a partial Prepayment, there will be no changes in the due date of my monthly payments unless the Note Holder agrees in writing to those changes.

My partial Prepayment may reduce the amount of my monthly payments after the first Interest Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase or other factors.

**6.      LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe

under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**
    **(A) Late Charges for Overdue Payments**
    If the Note Holder has not received the full amount of any monthly payment by the end of    **15** calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be    **5.0000**  % of such monthly payment due. I will pay this late charge promptly but only once on each late payment.
    **(B) Default**
    If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
    **(C) Notice of Default**
    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount.  That date must be at least thirty (30) days after the date on which the notice is delivered or mailed to me.
    **(D) No Waiver By Note Holder**
    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
    **(E) Payment of Note Holder's Costs and Expenses**
    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorney's fees.

**8.    GIVING OF NOTICES**
    Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
    Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**
    If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**
    I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.    UNIFORM SECURED NOTE**
    This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions read as follows:

Multistate Adjustable Rate Note – (5-Year Select Monthly ARM)
MFCD5091             Page 4 of 6        000515269-9    Initials:    e-872617 v6

"**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.   Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.   Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument.   If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

Borrower has executed and acknowledges receipt of pages 1 through 6 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____        _____(Seal)        _____(Seal)
FREDERICK S. BLUM                              -Borrower                -Borrower


_____        _____(Seal)        _____(Seal)
                                                  -Borrower                -Borrower


_____        _____(Seal)        _____(Seal)
                                                  -Borrower                -Borrower


[Sign Original Only]

Multistate Adjustable Rate Note – (5-Year Select Monthly ARM)
MFCD5091                        Page 6 of 6            000515269-9        la-872617 v6

Initials: _____



## ADDENDUM TO THE NOTE
### Prepayment Penalty
(Three Year Penalty Period)

This prepayment penalty addendum ("Addendum") is made this   26   day of   January 2007   ,
and is incorporated into and shall be deemed to amend and supplement the Note made by the
undersigned (the "Borrower") to   BankUnited, FSB

(the "Lender") and dated the same date as this Addendum (the "Note").

The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the
"Security Instrument") covering the property (the "Property") identified in the Security Instrument.

This Addendum provides for a penalty with respect to prepayments of the obligation represented
by the Note made within the first three years of the date of the Note.

Accordingly, Paragraph 5 of the Note (Borrower's right to prepay) is replaced with this
prepayment penalty addendum.

**Additional Covenants.**   In addition to the covenants and agreements made in the Note,
Borrower and Lender further covenant and agree as follows:

**Borrowers Right To Prepay – Prepayment Penalty.**

I have the right to make payments of principal at any time before they are due.  A payment of
principal only is known as a "prepayment".  When I make a prepayment, I will give notice to the
Note Holder in writing that I am doing so.

Subject to the prepayment penalty specified below, I may make a full prepayment or partial
prepayments of my obligation.  The Note Holder will use all of my prepayments to reduce the
amount of principal that I owe under this Note.  If I make a partial prepayment, there will be no
changes in the due date or in the amount of my monthly payment unless the Note Holder agrees
in writing to those changes.

If I make a prepayment within the first three years of the date of the Note, that pays the loan off
in full, I will pay a prepayment penalty in the amount of six months' advance interest (at the rate
of interest in effect at the time the full prepayment is made) on the original principal balance the
loan had on the initial date of the Note.

If I make partial prepayments of this loan during the first three years of the date of the Note, I will
pay a prepayment penalty in the amount of six months' advance interest (at the rate of interest
in effect at the time any such partial prepayments are made) on the amount by which the
aggregate prepayments made within any consecutive twelve month period exceed twenty
percent (20%) of the original principal balance the loan had on the initial date of the Note.  No
prepayment penalty will be assessed for any prepayment made after the first three years of the
date of the Note.

The Note Holder will waive the penalty upon a full prepayment after the first year of the date of
the note if I furnish the Note Holder with documentation, in the manner and time reasonably
specified by the Note Holder, identifying the full prepayment as being in connection with the sale
of the Property. I will give notice to the Note Holder 30 days prior to the sale by first class mail to

MFCD5039

000515269-9
3BPP  95141L1- 03/2006

the address stated in Section (3)A of the Note or at a different address if I am given notice of that different address.  The Note Holder will not waive the penalty for a full prepayment during the first year of the date of the Note even upon the sale of the Property.  The Note Holder will not waive the penalty upon partial prepayments made during the first three years of the date of the Note.

The Note Holder's failure to collect a prepayment penalty at the time a prepayment is received shall not be deemed a waiver of such penalty and any such penalty calculated in accordance with this section shall be payable on demand.

All other terms and conditions of the above referenced Note remain in full force and effect.   By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Penalty Addendum.

WITNESS THE HAND(S) AND SEALS OF THE UNDERSIGNED.


_____ (Seal)      _____ (Seal)
FREDERICK S. BLUM          -Borrower                              -Borrower


_____ (Seal)      _____ (Seal)
                           -Borrower                              -Borrower


DATE   January 26, 2007  _____

W/C 76
File No. HHR12398

PREPARED BY:

Name: **JEAN BENECHE**

Address: **BANKUNITED, FSB**

Return to:
**BANKUNITED, FSB
ATTN: POST CLOSING
7815 NW 148 STREET
MIAMI LAKES, FL  33016**

CFN 20070052065
OR BK 21365 PG 0615
RECORDED 02/01/2007 10:38:32
Palm Beach County, Florida
AMT 240,000.00
Deed Doc 840.00
Intang 480.00
Sharon R. Bock,CLERK & COMPTROLLER
Pgs 0615 - 632; (18pgs)

———————————[Space Above This Line For Recording Data]———————————

# MORTGAGE

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **January 26, 2007**                , together with all Riders to this document.
(B) "Borrower" is **FREDERICK S BLUM, A SINGLE MAN**

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is **BankUnited, FSB**
Lender is a **CORPORATION**                                              organized and existing under
the laws of **UNITED STATES OF AMERICA**                                         . Lender's address is
**7815 NW 148 STREET, MIAMI LAKES, Florida  33016**

                                           . Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated **January 26, 2007**             . The Note
states that Borrower owes Lender **Two Hundred Forty Thousand and no/100**
                              Dollars (U.S. $ **240,000.00**             ) plus interest. Borrower has promised
to pay this debt in regular Periodic Payments and to pay the debt in full not later than **February 01, 2037**               .
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

**FLORIDA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1615L1 (0011)                          *(Page 1 of 11 pages)*

**MFFL3112**

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

**000515269-9**

(H) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) **"Escrow Items"** means those items that are described in Section 3.

(L) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the

| COUNTY | of | PALM BEACH | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**SEE ATTACHED LEGAL DESCRIPTION MADE A PART HERETO.**

which currently has the address of          **9085 C SW 20TH STREET**
[Street]

**BOCA RATON**      , Florida      **33428**      ("Property Address"):
[City]                       [Zip Code]

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010 1/01
ITEM 1615L2 (0011)                    *(Page 2 of 11 pages)*        GREATLAND ■
**MFFL3112**                                          To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131
**000515269-9**

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.    Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.    Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L3 (0011)

**MFFL3112**

*(Page 3 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

**000515269-9**

Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may

**FLORIDA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1615L4 (0011)

**MFFL3112**

*(Page 4 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

**000515269-9**

38 of 62

require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L5 (0011)
MFFL3112

*(Page 5 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

000515269-9

39 of 62

disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

**FLORIDA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1615L6 (0011)          *(Page 6 of 11 pages)*
MFFL3112

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
000515269-9

40 of 62

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this

**FLORIDA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1815L7 (0011)
MFFL3112

*(Page 7 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 616-791-1131
**000515269-9**

41 of 62

Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.   Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.   Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.   Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15.   Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L8 (0011)
MFFL3112

*(Page 8 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

000515269-9

42 of 62

16.   **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17.   **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18.   **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.   **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20.   **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the

---

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L9 (0011)
MFFL3112

*(Page 9 of 11 pages)*

Form 3010 1/01

GREATLAND ∎
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

000515269-9

43 of 62

other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.  Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23.  Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.  Attorneys' Fees. As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25.  Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    Form 3010 1/01

ITEM 1815L10 (0011)                                               (Page 10 of 11 pages)                          GREATLAND ■
MFFL3112                                                                                   To Order Call: 1-800-530-9393 □ Fax: 615-791-1131
                                                                                                          000515269-9

44 of 62

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 11 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)        _____ (Seal)
FREDERICK S. BLUM                      -Borrower                                              -Borrower


_____ (Seal)        _____ (Seal)
                                       -Borrower                                              -Borrower


_____ (Seal)        _____ (Seal)
                                       -Borrower                                              -Borrower


Signed, sealed and delivered in the presence of:

_____                _____
        ZAHERA SADIK                                      BARBARA RODRIGUEZ


State of Florida
County of  *Palm Beach*

The foregoing instrument was acknowledged before me this  26th  day of  January 2007  by

*Frederick S. Blum*

who is personally known to me or who has produced  *FL Drivers license*

as identification.

                                                          _____
                                                                          Notary Public

ZAHERA SADIK
Notary Public - State of Florida
My Commission Expires Dec 4, 2010
Commission # DD 619567


FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010 1/01
ITEM 1615L11 (0011)                                                                      GREATLAND ■
MFFL3112                              *(Page 11 of 11 pages)*        To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
                                                                          000515269-9

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **26th** day of **January 2007**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **BankUnited, FSB**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**9085 C SW 20TH STREET
BOCA RATON, FL  33428**

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **the Declaration of Covenants, Conditions, and Restrictions**

(the "Declaration"). The Property is a part of a planned unit development known as

**SANDLEFOOT COVE**

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

---

MULTISTATE PUD RIDER—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3150 1/01

ITEM 1622L1 (0411)                              *(Page 1 of 2 pages)*          GreatDocs™
                                                                               To Order Call: 1-800-968-5775

MFCD2062                                                                       000515269-9

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

    **C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

    **D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

    **E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

    **F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 and 2 of this PUD Rider.

_____ (Seal)       _____ (Seal)
FREDERICK S. BLUM       -Borrower                                    -Borrower

_____ (Seal)       _____ (Seal)
                        -Borrower                                    -Borrower

_____ (Seal)       _____ (Seal)
                        -Borrower                                    -Borrower

---

**MULTISTATE PUD RIDER**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    **Form 3150 1/01**

ITEM 1622L2 (0411)                *(Page 2 of 2 pages)*                GreatDocs™
MFCD2062                                              To Order Call: 1-800-968-5775

                                                        **000515269-9**



## Adjustable Rate Rider
### (5-Year Select Monthly ARM)

THIS ADJUSTABLE RATE RIDER is made this **26th** day of **January 2007**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note, as modified or amended (the "Note") to **BankUnited, FSB**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**9085 C SW 20TH STREET
BOCA RATON, FL 33428**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT, AND THE PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED.  BOTH MY MAXIMUM INTEREST RATE AND MINIMUM INTEREST RATE ARE LIMITED.  MY INITIAL REQUIRED MONTHLY PAYMENT AMOUNT WILL NOT BE SUFFICIENT TO PAY THE INTEREST THAT ACCRUES UNDER THE NOTE. THE PRINCIPAL BALANCE OF THE NOTE MAY INCREASE TO AN AMOUNT THAT IS LARGER THAN THE AMOUNT THAT I ORIGINALLY BORROWED.**

**ADDITIONAL COVENANTS.**  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.     INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows:

**2.      INTEREST**
**(A) Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of **7.5000** %.  The interest rate I will pay will change as provided in this Section 2.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.
**(B) Interest Change Dates**
The interest rate I will pay may change on the first day of **February 2012** and on that same day every month thereafter.  Each date on which my interest rate could change is called an "Interest Change Date".
**(C) Interest Rate Limits**
My interest rate will never be greater than **10.9500** %.  My interest rate will never be less than the amount of the then applicable Margin described in Section 2(E) below.

Multistate Adjustable Rate Rider – (5-Year Select Monthly ARM)

MFCD5092                      Page 1 of 4                    000515269-9        Initials: _____ 10581596v4

**(D) Index**
Beginning with the first Interest Change Date, my interest rate will be based on an Index.  The "Index" is the twelve-month average of the monthly yields (the "Monthly Yields") on actively traded non-inflation-indexed United States Treasury securities adjusted to a constant maturity of one year as published by the Board of Governors of the Federal Reserve System in Federal Reserve Statistical Release H.15, which is entitled "Selected Interest Rates".  The twelve-month average is determined by adding together the Monthly Yields for the most recently available twelve months, dividing that sum by 12, and then rounding the resulting number to four decimal places.  The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."

If the Index, or any substitute Index, is no longer available, the Note Holder will choose a new Index which is based upon comparable information.  The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**
Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and One Quarter** percentage points (   3.2500    %) (the "Margin") to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one-percentage point (0.125%).  Subject to the limits stated in Section 2(C) above, the rounded amount will be my new interest rate, which will become effective on the Interest Change Date.  That interest rate will remain in effect until the next Interest Change Date.

In the event a new Index is selected in accordance with Section 2(D) above, a new Margin may be established.  The new Index and Margin will result in an interest rate that is substantially similar to the interest rate that was in effect at the time that the old Index became unavailable.

3.      **PAYMENTS**
        **(A) Time and Place of Payments**
        I will make my monthly payments on the first day of every month, beginning on      **March 2007** I will make a payment every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on  **February 1, 2037** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

        I will make monthly payments at  **7815 NW 148 ST., MIAMI LAKES, FL  33016**

                                            or at a different place if required by the Note Holder.
        **(B)  Monthly Payments During the Initial Five Year Period**
        My initial monthly payments will be in the amount of U.S. **$1,005.39**          .  These monthly payments are equal to the amount that would be sufficient to repay the initial Principal, together with interest at the rate of **2.9500**            %, in full in substantially equal monthly installments through the Maturity Date.  The rate used to calculate these monthly payments is lower than the initial interest rate stated in Section 2(A) above.  The Note Holder's monthly billing statement may disclose other payment options that I may have, if I should wish to pay a monthly payment that is larger than the required amount.
        The amount of my initial monthly payment will change as provided in this Section 3.
        **(C) Monthly Payments During the Remaining Term of this Note**
        My monthly payment can change on the due date of my sixty-first (61st) payment, which is due on      **March 1, 2012**        , and on that same day every twelfth (12th) month thereafter.  Each of these dates is called a "Payment Change Date."  On each Payment Change Date, my monthly payment will change to the amount that would be sufficient to repay the Principal that I am expected to owe on the Payment Change Date, together with interest at the rate in effect during the preceding month, in full in substantially equal monthly installments through the Maturity Date.  However, unless Section 3(E) or Section 3(F) below applies, the amount of my new monthly payment, beginning on each Payment Change Date, will be limited to an amount that is no more than 7 1/2% greater than the monthly payment

Initials:

I am required to pay under this Note immediately prior to that Payment Change Date.  The Note Holder's monthly billing statement may disclose other payment options that I may have, if I should wish to pay a monthly payment that is larger than the required amount.

I will pay the amount of my new monthly payment each month, beginning on each Payment Change Date, until the next Payment Change Date, unless my monthly payments are changed earlier as provided in Section 3(E) below.

**(D) Changes in My Unpaid Principal**

My initial required monthly payment amount will not be sufficient to pay the interest that will accrue under this Note at the initial interest rate stated in Section 2(A) of this Note.  In addition, since (after the first Payment Change Date) my monthly payment amount changes less frequently than the interest rate, and since my monthly payment is subject to the payment limitations described in Section 3(C) above, my subsequent monthly payments could be lesser or greater than the amount sufficient to pay the interest that will accrue at the interest rates that are in effect under this Note from time to time. For each month that my monthly payment is less than the interest that accrues under this Note, the Note Holder will subtract the monthly payment from the amount of the accrued interest and will add the difference to my unpaid Principal, and additional interest will accrue on the amount of this difference at the interest rate that is in effect under this Note from time to time.  For each month that the monthly payment is greater than the interest that accrues under this Note, the Note Holder will apply the excess towards a Principal reduction of this Note.

**(E) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to 115% of the original Principal of this Note.  In the event my unpaid Principal would otherwise exceed that 115% limitation on a monthly payment due date, I will begin paying a new monthly payment on that monthly payment due date, and will continue to make this payment each month until the next Payment Change Date, subject at all times to a further increase in my monthly payment under this Section 3(E) if my unpaid Principal would again otherwise exceed the 115% limitation.  My new monthly payment will be the amount that would be sufficient to repay the unpaid Principal I am expected to owe on the monthly payment due date, together with interest at the rate in effect during the month prior to the monthly payment due date, in full in substantially equal monthly installments through the Maturity Date.

In each case, the new monthly payment will be determined without applying the 7 1/2% payment limitation described in Section 3(C) above.

**(F) Required Full Monthly Payment**

On the first Payment Change Date, on each fifth (5 th) Payment Change Date thereafter, and on the final Payment Change Date, my monthly payment will be determined without regard to the 7 1/2% payment limitation described in Section 3(C) above.

**4.     NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me, and also the title and telephone number of a person who will answer any question I may have regarding the notice."

**B.     TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read, in its entirety, as follows:

"**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.   Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 4 of this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
FREDERICK S. BLUM                   -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                    -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                    -Borrower                                          -Borrower


[Sign Original Only]

Multistate Adjustable Rate Rider – (5-Year Select Monthly ARM)
                                Page 4 of 4                    16-001596-74
MFCD5092                                        000515269-9      Initials:

**EXHIBIT "A"**

Building 1, Unit 3, more particularly described as:

The Easterly 37.28 feet of the Westerly 117.24 feet as measured at right angles SITE ONE SANDAL FOOT COVE SECTION TWELVE REPLAT according to the Plat thereof as recorded in Plat Book 51 at Page 7 and 8 of the Public Records of Palm Beach County, Florida.

HHR12398

# Policy of Title Insurance

## Commonwealth Land Title Insurance Company

## Schedule A

Order Number: 50306802CA

Policy Number: ███████

Reference Number: HHR12398

Amount of Insurance: $240,000.00

Date of Policy: The date shown below or the date of recording of the instruments referred to in Item 4, whichever is the later.

FEBRUARY 1, 2007 @ 10:38 A.M.

1. Name of Insured

   BankUnited, FSB, its successors and or assigns as their interest may appear

2. The estate or interest in the land described herein and which is covered by this policy is:
   Fee Simple

3. Title to the estate or interest in the land is vested in:
   Frederick S. Blum

4. The insured mortgage and the assignments, thereof, if any, are described as follows:

   Mortgage executed by Frederick S. Blum, a single man, in favorl of BankUnited, FSB, dated January 26, 2007, recorded February 1, 2007 in Official Records Book 21365, Page 615, of the Public Records of Palm Beach County, Florida, securing the original principal sum of $240,000.00.

5. The Land referred to in this policy is described as follows:
   (See attached Exhibit A for legal description)

Harbor Title, LLC

219 N. Dixie Highway
Lake Worth, FL 33460

This policy is invalid unless a cover sheet and Schedule B are attached.

**Exhibit A**

**Policy Number:** ███████

Building 1, Unit 3, more particularly described as follows: The Easterly 37.28 feet of the Westerly 117.24 feet as measured at right angles site one SANDALFOOT COVE SECTION TWELVE REPLAT, according to the Plat thereof, as recorded in Plat Book 51, at Page 7, of the Public Records of Palm Beach County, Florida.

## Schedule B - Part I

Policy Number: ▮▮▮▮▮▮▮

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes and assessments for the year 2007 and subsequent years.

2. Matters as contained on the Plat of SANDALFOOT COVE SECTION TWELVE REPLAT recorded in Plat Book 51, page 7, of the public records of Palm Beach County, Florida.

3. Terms, conditions, and provisions of Easement to Lake Worth Drainage District, recorded in Official Records Book 3507, Page 92.

4. Terms, conditions, and provisions of Easement, recorded in Official Records Book 2937, Page 1679.

5. Terms, conditions, and provisions of Easement, recorded in Official Records Book 3841, Page 1060 and assignment recorded in Official Records Book 4105, at Page 1751.

6. Restrictions, covenants, conditions and easements, which include provisions for a private charge or assessment, as contained in that certain Declaration of Covenants recorded in Official Records Book 4630, Page 1674 and any amendments thereto.

   NOTE: This exception omits any restriction, covenant, or condition based on race, color, religion, sex, handicap, familial status or national origin, if any, unless and only to the extent that the restriction is not in violation of state or federal law, or relates to a handicap, but does not discriminate against handicapped people.

7. Terms, conditions, and provisions of Easement, recorded in Official Records Book 4689, Page 408.

8. Terms, conditions, and provisions of Easement, recorded in Official Records Book 4614, Page 1746.

9. Terms, conditions, and provisions of Easement, recorded in Official Records Book 2074, Page 1372.

10. Terms, conditions, and provisions of Developers Agreement, recorded in Official Records Book 5612, Page 1226.

11. Matters as disclosed on Survey prepared by GPS Land Surveying, Inc., dated January 18, 2007under Job Order No. 01-057-07.


NOTE: All recording references in this commitment/policy shall refer to the Public Records of Palm Beach County, Florida, unless otherwise noted.

NOTE: In accordance with Florida Statutes section 627.4131, please be advised that the insured hereunder may present inquiries, obtain information about coverage, or receive assistance in resolving complaints, by contacting the Commonwealth Land Title Insurance Company Regional Office, 201 South Orange Avenue, Suite 1350, Orlando, FL 32801 Telephone 407-481-8181.

## Schedule B - Part II

Policy Number: ████████

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the Company insures that such matters are subordinate to the lien or charge of the insured mortgage upon said estate or interest.

NONE

## Commonwealth Land Title Insurance Company

ENDORSEMENT

**Attached to and made a part of Policy Number:** ▮▮▮▮▮▮▮▮

The Company insures the insured against loss or damage sustained by reason of:

1. Present violations of any restrictive covenants referred to in Schedule B which restrict the use of the land, except violations relating to environmental protection unless a notice of a violation hereof has been recorded or filed in the public records and is not excepted in Schedule B. The restrictive covenants do not contain any provisions which will cause a forfeiture or reversion of title.
2. Any charges or assessments in favor of any association of homeowners which are provided for in any document referred to in Schedule B due and unpaid at Date of Policy.
3. The enforced removal of any existing structure on the land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.
4. The failure of title by reason of a right of first refusal to purchase the land which was exercised or could have been exercised at Date of Policy.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

IN WITNESS WHEREOF, the Company has caused this endorsement to be issued and valid when signed by an authorized officer or licensed agent of the Company.

Harbor Title, LLC

_____
Authorized Officer or Licensed Agent

Endorsement - Form 5.1 Planned Unit Development Endorsement

## Commonwealth Land Title Insurance Company

ENDORSEMENT

**Attached to and made a part of Policy Number:** █████████

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.  The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for: (a) interest on interest; (b) changes in the rate of interest; or (c) the addition of unpaid interest to the principal balance of the loan.

2.  Loss of priority of the lien of the insured mortgage as security for the principal balance of the loan, including any unpaid interest which was added to principal in accordance with the provisions of the insured mortgage, interest on interest, or interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by (a) changes in the rate of interest; (b) interest on interest; (c) increases in the unpaid principal balance of the loan resulting from the addition of unpaid interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only thoses changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon (a) usury, or (b) any consumer credit protection or truth-in-lending law.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto, except that the insurance afforded by this endorsement is subject to neither Section 3 (d) of the Exclusions From Coverage nor Section 8(d) of the Conditions and Stipulations. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

IN WITNESS WHEREOF, the Company has caused this endorsement to be issued and valid when signed by an authorized officer or licensed agent of the Company.

Harbor Title, LLC

_____
Authorized Officer or Licensed Agent

Endorsement - Variable Rate Mortgage Endorsement Negative Amortization

## Commonwealth Land Title Insurance Company

ENDORSEMENT

**Attached to and made a part of Policy Number:** ███████

The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.

The Company insures the insured against loss or damage sustained by reason of lack of priority of the lien of the insured mortgage over:

    a.  any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the Clerk of the United States District Court for the district in which the land is located, except as set forth in Schedule B; or

    b.  any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes: None.

This endorsement is made a part of this policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

IN WITNESS WHEREOF, the Company has caused this endorsement to be issued and valid when signed by an authorized officer or licensed agent of the Company.

Harbor Title, LLC

_____
Authorized Officer or Licensed Agent

Endorsement - Environmental 8.1

## Commonwealth Land Title Insurance Company

ENDORSEMENT

**Attached to and made a part of Policy Number:** ███████████

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:
1. Any incorrectness in the assurance that, at date of policy:

    a.  There are no covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.
    b.  Unless expressly excepted in Schedule B:
        (1). There are no present violations on the land of any enforceable covenants, conditions or restrictions nor do any existing improvements on the land violate building setback lines shown on a plat of subdivision recorded or filed in the public records.
        (2). Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land does not, in addition, (i) establish an easement on the land; (ii) provide a lien for liquidated damages; (iii) provide for a private charge or assessment; (iv) provide for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.
        (3). There is no encroachment of existing improvements located on the land onto adjoining land, nor any encroachment onto the land of existing improvements located on adjoining land.
        (4). There is no encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.
        (5). There are no notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records.

2. Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in the land, provided the violation results in:

    a.  Impairment or loss of the lien of the insured mortgage; or
    b.  Loss of title to the estate or interest in the land if the insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.

3. Damage to existing improvements (excluding lawns, shrubbery or trees).
a. Which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved.
b. Which results from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule B.
4. Any final court order or judgment requiring the removal from any land adjoining the land of any encroachment excepted in Schedule B.
5. Any final court order or judgment denying the right to maintain any existing improvement to the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat or subdivision recorded or filed in the Public Records.
Wherever in this endorsement the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.
As used in paragraphs 1(b)(1) and 5, the phrase "covenants, conditions or restrictions" shall not be deemed to refer to or include the terms, covenants conditions or restrictions relating to environmental protection.
This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.
IN WITNESS WHEREOF, the Company has caused this endorsement to be issued and valid when signed by an authorized officer or licensed agent of the Company.

Harbor Title, LLC

_____
Authorized Officer or Licensed Agent

Endorsement - Form 9

# CIVIL COVER SHEET

≈JS 44 (Rev. 2/08)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Bankunited as Successor in interest to Bankunited, F.S.B | Frederick S. Blum |
| **(b)** County of Residence of First Listed Plaintiff _____ (EXCEPT IN U.S. PLAINTIFF CASES) | Palm Beach  County of Residence of First Listed Defendant _____ (IN U.S. PLAINTIFF CASES ONLY)  NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED. |
| **(c)** Attorney's (Firm Name, Address, and Telephone Number)  Joseph Towne, Esq. Lender Legal Services, LLC | Attorneys (If Known)  Pro Se |

(d) Check County Where Action Arose:  ☐ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☑ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☑ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities Employment
- ☐ 446 Amer. w/Disabilities Other
- ☐ 440 Other Civil Rights

PERSONAL INJURY
- ☐ 362 Personal Injury – Med. Malpractice
- ☐ 365 Personal Injury – Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus-Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☑ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding  ☑ 2 Removed from State Court  ☐ 3 Re-filed (see VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

a) Re-filed Case ☐ YES ☐ NO   b) Related Cases ☐ YES ☑ NO

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):   JUDGE _____   DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

15 U.S.C. 1692

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ 289,000.00   CHECK YES only if demanded in complaint:  JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD _____   DATE 10/1/14

**FOR OFFICE USE ONLY**

AMOUNT _____   RECEIPT # _____   IFP _____